**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 18-3682

———————

WILLASHIA WILLIAMS

v.

CITY OF YORK, PENNSYLVANIA; VINCENT MONTE;
TERRY SEITZ; NICHOLAS FIGGE

Vincent Monte; Terry Seitz; Nicholas Figge,
Appellants

———————

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-15-cv-00493)
District Judge: Honorable Sylvia H. Rambo

———————

Argued on October 29, 2019

Before: HARDIMAN, PHIPPS, and NYGAARD, *Circuit Judges*.

(Filed July 24, 2020)

Frank J. Lavery Jr. [Argued]
Stephen B. Edwards
Lavery Law
225 Market Street
Suite 304, P.O. Box 1245
Harrisburg, PA 17108

Donald B. Hoyt
City of York
101 South George Street
York, PA 17401
  *Attorneys for Appellants Vincent Monte and Nicholas Figge*

Sean P. McDonough
Dougherty Leventhal & Price
75 Glenmaura National Boulevard
Moosic, PA 18507
  *Attorney for Appellant Nicholas Terry Seitz*

Frank J. Lavery Jr. [Argued]
Stephen B. Edwards
Lavery Law
225 Market Street
Suite 304, P.O. Box 1245
Harrisburg, PA 17108
  *Attorney for City of York*

Lisa W. Basial[*]
[Argued]
Niles Benn
James F. Logue
Benn Law Firm
103 East Market Street
P.O. Box 5185
York, PA 17405
              *Attorney for Appellee Willashia Williams*

———————

OPINION OF THE COURT

———————

HARDIMAN, *Circuit Judge*.

When a district court denies a public official qualified immunity at summary judgment and the official appeals, the scope of our review is limited. We can review "whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right." *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 61 (3d Cir. 2002). But generally, "we lack jurisdiction to consider whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove." *Id.* In recognition of that limited jurisdiction, we have announced two supervisory rules that facilitate our review and enhance the reliability of district courts' decisionmaking. First, in *Forbes v. Township of Lower Merion*, 313 F.3d 144 (3d Cir. 2002), we

_____

[*] Lisa W. Basial withdrew her appearance after the case was argued.

3

required district courts "to specify those material facts that are and are not subject to genuine dispute and explain their materiality." *Id.* at 146. Second, in *Grant v. City of Pittsburgh*, 98 F.3d 116 (3d Cir. 1996), we required courts to "analyze separately, and state findings with respect to, the specific conduct of each [defendant]." *Id.* at 126.

This appeal provides an occasion for us to stress the importance of these supervisory rules. Willashia Williams sued the City of York and three of its police officers under 42 U.S.C. § 1983, claiming excessive force and false arrest. The District Court rejected the officers' qualified immunity defense, and they appealed. In so doing, the Court did not appreciate the significance of our recent decision in *Jutrowski v. Township of Riverdale*, 904 F.3d 280 (3d Cir. 2018). As a result, it risked subjecting the officers to trial regardless of whether Williams can establish their personal involvement in the constitutional violations she alleges. Had the District Court followed the two supervisory rules that we emphasize today, it would have facilitated appellate review and enhanced the reliability of its decision.

Because the District Court erred in concluding the officers are not entitled to qualified immunity for false arrest and the excessive force Williams alleges, we will reverse.

I

On the evening of March 12, 2013, a police officer in York, Pennsylvania reported a shooting over the radio and said the suspects fled in a white vehicle. The suspects' vehicle pulled in front of Sergeant Nicholas Figge, who was in uniform but driving an unmarked police car. Figge saw three people in the vehicle. He and Officer Jason Jay pursued the vehicle,

4

which crashed outside of their view. When Jay arrived at the scene of the crash, the driver and other passenger had already fled from the scene, but he saw one of the passengers flee southward on foot. Figge arrived moments later but left to pursue the driver, who was reportedly running northward. After Figge left, Jay found a spent .38 caliber shell casing inside the vehicle.

According to Williams, she and her then-boyfriend Jason Scott were at a park in York shortly before the shooting, and an unidentified police officer told them to evacuate the area. To get home more quickly, they decided to run.

While still "within close geographical proximity" to the crash, Figge observed Williams and Scott running eastbound on Princess Street toward Pine Street, which goes northward. *Williams v. City of York*, 2018 WL 5994603, at *1, *6 n.14 (M.D. Pa. Nov. 15, 2018). Figge reported his observations over the radio, stating, "They're running. They're running eastbound on Princess towards Pine. One of the guys has kind of a red jacket on, long dreads, blue pants, with a white stripe. The other guy's got a black jacket with an orange stripe." *Id.* at *1. Figge held his firearm outside the window of his vehicle and ordered Williams and Scott to get on the ground. Scott complied immediately, but Williams ran to the porch of a house and started pounding on the door. Figge stayed in his police car until other officers arrived.

Moments later, Officer Vincent Monte arrived and saw Williams and Scott face down on the ground. Monte parked his car and handcuffed Scott. Once other officers arrived, including Officer Terry Seitz, Figge exited his vehicle and told them to "grab" Williams. *Id.* According to Williams, Seitz "threw her to the ground [and] the officers were 'really forceful

5

and rough with [her], like [she] was a man.'" *Id.* Williams complained and yelled at the officers that she needed to "pick a wedgie," but was unable to do so because she was lying on her stomach. *Id.* at *2; Monte Exterior Cam 2:24-30. According to Figge, Monte, and Seitz (collectively, the Officers), Williams "was kicking, flailing around, being disorderly, and yelling while she was being handcuffed." *Id.* at *2. And she "refused orders to place her hands behind her back, was being uncooperative, and swearing at officers." *Id.* Seitz eventually handcuffed Williams, while an unidentified officer placed a knee on her back. After police took Williams and Scott into custody, an officer ordered someone to get on the ground, and Scott yelled at Williams, "Hey babe, calm down man!" *Id.*

As Seitz was walking Williams to his car, she tripped on an unidentified officer's foot. Monte could not have tripped Williams because his dashcam footage shows him placing Scott in his police car at the time Williams tripped. But Monte did see Williams "on the ground kicking and screaming." *Id.* Williams then had the following interaction with officers:

> Officer: "If you don't stop, I am going to tase you!"
>
> Officer: "Stop or I'll tase you!"
>
> Officer: "Relax! Relax!"
>
> Williams: "Get off of me!"
>
> Officer: "Stop or I'll tase you!"
>
> Williams: "Get off of me!"
>
> Officer: "Relax!"

6

Williams: "Get off of me!"

Officer: "There ain't nothing you're going to say or do that is going to get you out of . . ."

Williams: "I'm not doing shit!"

Officer: "Shut your mouth."

Williams: ". . . my fucking . . ."

Officer: "Now stand up and act like you have some sense."

*Id.*

Figge ordered Seitz to cite Williams for disorderly conduct. Seitz then placed Williams in his car and transported her to City Hall. According to the Officers, when Williams was at City Hall she "was extremely noisy, loudly pounding her free arm on a metal wall." *Id.* Seitz handcuffed Williams's left arm to a bench. While handcuffed, her boyfriend (Scott) yelled at Williams to calm down, and Figge ordered an unidentified officer to handcuff Williams's right arm to the bench as well. Williams claims "her wrist was hurting" and she asked the unidentified officer to remove the handcuffs. *Id.* She also claims that the unidentified officer "approached her, twisted her arm, threw her against the wall, and threatened if she did not give him her arm, he would break it." *Id.* At some point while Williams was at City Hall, Figge asked her to calm down and she complied.

Williams was later found not guilty of disorderly conduct. She sued the City of York and the Officers in the District Court under 42 U.S.C. § 1983. Against the Officers,

7

she asserted federal claims for excessive force and false arrest and state law claims for battery and false imprisonment. Against York, she asserted federal claims for excessive force and false arrest. The parties cross-moved for summary judgment, and the Officers claimed qualified immunity. The District Court granted summary judgment to York on the false arrest claim and to Officer Monte on the § 1983 false arrest and state law false imprisonment claims. It denied the motions in all other respects.

The Court concluded that "disputed issues of fact prevent[ed] application of qualified immunity to Sergeant Figge, Officer Monte, and Officer Seitz for [the] excessive force claim." *Id.* at *8. It identified the disputed factual issues as "whether Officer Seitz threw [Williams] to the ground, and whether Sergeant Figge, Officer Monte, or Officer Seitz twisted her arm, threw her against a wall, and handcuffed her wrists too tightly at City Hall." *Id.* The Court also concluded it could not grant Figge and Seitz summary judgment on qualified immunity grounds for the false arrest claim "in light of . . . genuine issues of material fact." *Id.* But it did not identify the factual issues to which it referred. Instead, after concluding that Figge and Seitz had reasonable suspicion to detain Williams, it said, "[a]ccording to [Williams's] account of the incident . . . a reasonable police officer would [not] believe he had probable cause to arrest [Williams]." *Id.* at *8.

The Officers timely appealed the District Court's order denying them qualified immunity.

8

## II

## A

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291 pursuant to the collateral order doctrine. *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 985 (3d Cir. 2014). To the extent we have jurisdiction, our review is plenary. *Id*. at 986.

Summary judgment is proper when the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Under the Supreme Court's decision in *Johnson v. Jones*, 515 U.S. 304 (1995), we lack jurisdiction to review the District Court's denial of qualified immunity when "the pretrial record sets forth a 'genuine' issue of fact for trial." *Id.* at 320. If the District Court did not state the facts it assumed, though, we may "undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." *Id*. at 319.[1]

---

[1] Williams argues we lack jurisdiction to hear this appeal under *Johnson*. We disagree. *Johnson* does not apply if a district court's determination that a fact is subject to reasonable dispute is "blatantly and demonstrably false." *Blaylock v. City of Phila.*, 504 F.3d 405, 414 (3d Cir. 2007). And even when *Johnson* applies, it deprives us of jurisdiction "to consider *whether the district court correctly identified* the set of facts that the summary judgment record is sufficient to prove." *Ziccardi*, 288 F.3d at 61 (emphasis added). It does not affect our jurisdiction to review "whether the set of facts

In recognition of our limited jurisdiction under *Johnson*, we have announced two supervisory rules that apply whenever a district court denies a public official qualified immunity at summary judgment.

First, in *Grant*, we remanded a case involving multiple defendants so the district court could "analyze separately, and state findings with respect to, the specific conduct of each [defendant]." 98 F.3d at 126. We recognized as "crucial" to the qualified immunity analysis a "careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff)." *Id.* at 122 (citing *Johnson*, 515 U.S. at 305). One purpose of the *Grant* rule is to ensure that district courts enforce the tenet, "manifest in our excessive force jurisprudence," that a "plaintiff alleging that one or more officers engaged in unconstitutional conduct must establish the 'personal involvement' of each named defendant to survive summary judgment and take that defendant to trial." *Jutrowski*, 904 F.3d at 285, 289.

Second, in *Forbes*, we announced a rule requiring district courts "to specify those material facts that are and are not subject to genuine dispute and explain their materiality." 313 F.3d at 146. This requirement reflects our understanding that because the "scope of our jurisdiction to review [a district

_____

identified by the district court is sufficient to establish a violation of a clearly established constitutional right." *Id.* Our analysis adopts the District Court's factual determinations except when they are blatantly and demonstrably false. And, when appropriate, we determine what facts the Court likely assumed. Thus, we are within our jurisdiction.

court's decision denying summary judgment] depends upon the precise set of facts that the [d]istrict [c]ourt viewed as subject to dispute," we are "hard pressed to carry out our assigned function" when district courts fail to specify the set of facts they assumed. *Id.* at 146, 148. While it is true that *Johnson* contemplates that we may review the record ourselves, *Johnson*, 515 U.S. at 319, *Forbes* reduces the frequency with which we take on this "cumbersome" task and allows us the alternative of vacating and remanding.

Since announcing these supervisory rules, we have also recognized a narrow exception to the limits that *Johnson* places on our jurisdiction: "where the trial court's determination that a fact is subject to reasonable dispute is *blatantly and demonstrably false*, a court of appeals may say so, even on interlocutory review." *Blaylock v. City of Phila.*, 504 F.3d 405, 414 (3d Cir. 2007) (emphasis added).

This exception derives from the Supreme Court's decision in *Scott v. Harris*, 550 U.S. 372 (2007). There, a police officer (Scott) rammed the vehicle of a fleeing motorist (Harris), causing Harris to lose control of his vehicle and crash. *See id.* at 375. Harris sued for excessive force. *See id.* at 375–76. The district court denied Scott qualified immunity, finding a genuine dispute of material fact about whether Harris "present[ed] an immediate threat to the safety of others," *Harris v. Coweta County, Georgia*, 2003 WL 25419527, at *5 (N.D. Ga. 2003), and the Eleventh Circuit affirmed. *Scott*, 550 U.S. at 376.

The Supreme Court reversed, concluding there was no genuine dispute that Harris presented an immediate threat to others. *See id.* at 378, 386. In support, it cited a videotape of the incident that "quite clearly contradict[ed] the version of the

11

story told by [Harris]." *Id.* at 378. That video, the Court said, "resemble[d] a Hollywood-style car chase of the most frightening sort." *Id.* at 380. The Court did not resolve the tension between its decision and *Johnson*. But in *Blaylock*, we explained that *Scott* "represent[s] the outer limit of the principle of *Johnson*." *Blaylock*, 504 F.3d at 414.

B

The doctrine of qualified immunity shields officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "To resolve a claim of qualified immunity, [we] engage in a two-pronged inquiry: (1) whether the plaintiff sufficiently alleged the violation of a constitutional right, and (2) whether the right was clearly established at the time of the official's conduct." *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 241 (3d Cir. 2016) (internal quotation marks omitted). We perform this inquiry "in the order we deem most appropriate for the particular case before us." *Santini v. Fuentes*, 795 F.3d 410, 418 (3d Cir. 2015) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

A clearly established right must be so clear that every "reasonable official would [have understood] that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). We do not charge officials with such an understanding unless existing precedent has "placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). And we examine an official's "particular conduct" *id.* at 742, in "the specific context of the case." *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (overturned on other grounds); *see also Mullenix v. Luna*, 136

S. Ct. 305, 308 (2015) (noting that specificity is "especially important" in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how relevant legal doctrines will apply to the factual situation before him). In short, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

## III

Williams claims excessive force arising out of the Officers' conduct at the scene of her arrest and at City Hall. As we shall explain, the District Court did not comply with our supervisory rules in conducting its qualified immunity analysis, and it erred in concluding that the Officers are not entitled to qualified immunity on this claim. So we will reverse.

## A

A cause of action exists under § 1983 when a law enforcement officer uses force so excessive that it violates the Fourth and Fourteenth Amendments to the United States Constitution. *See Brown v. Borough of Chambersburg*, 903 F.2d 274, 277 (3d Cir. 1990). To maintain an excessive force claim, "a plaintiff must show that a seizure occurred and that it was unreasonable." *Estate of Smith v. Marasco*, 318 F.3d 497, 515 (3d Cir. 2003) (internal quotation marks omitted). Here, the parties agree that Williams's detention and arrest constituted a seizure, so the District Court had to consider only whether the force officers used was reasonable.

"The test of reasonableness under the Fourth Amendment is whether under the totality of the circumstances,

'the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386, 387 (1989)). The Supreme Court has cautioned that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

B

We address separately the excessive force Williams alleges took place at the scene of the arrest and at City Hall.

1

Relative to the scene of the arrest, Williams claims: (1) Seitz threw her to the ground; (2) officers failed to loosen her handcuffs; and (3) officers put a knee to her back, tripped her, and were "forceful and rough" in handling her.

The District Court found "[t]he undisputed facts establish that Officer Seitz handcuffed [Williams] at the time of her arrest and an officer placed his knee on [Williams's] back. *Williams*, 2018 WL 5994603, at \*7. The Court also noted Williams "alleges that during her arrest, Officer Seitz threw her to the ground and officers were forceful and rough in handling her." *Id.* The Court determined these facts, if true, "would establish that the officers' use of force was excessive in violation of the Fourth Amendment," but that it could not

14

resolve these factual disputes because "the reasonableness of the force used should be determined by a jury." *Id.*

Accepting the facts the District Court identified, Seitz did not violate Williams's constitutional rights by throwing her to the ground. The parties do not dispute that officers were responding to a shots-fired call, Williams was running in close proximity to the shooting, and when Figge ordered her to get on the ground, she ran to the porch of a house and started pounding on the door instead of complying with his order. Given these facts, it was not unreasonable for Seitz to throw Williams to the ground. *See Graham*, 490 U.S. at 396–97. So the District Court erred in concluding Seitz was not entitled to qualified immunity.

Nor can Williams show that Figge, Monte, or Seitz violated her constitutional rights by failing to loosen her handcuffs. We have declined to hold officers liable in such circumstances unless they are notified of an arrestee's pain. In *Kopec v. Tate*, 361 F.3d 772 (3d Cir. 2004), for example, Kopec claimed excessive force when the arresting officer failed to loosen his handcuffs. *Id.* at 777. We reversed a summary judgment in favor of the officer because Kopec's pain would have been obvious to the officer. *See id.* at 774. Specifically, Kopec complained repeatedly about the pain and "began to faint." *Id.* We cautioned that our opinion "should not be overread as we do not intend to open the floodgates to a torrent of handcuff claims." *Id.* at 777. Consistent with that admonition, we later held, in *Gilles v. Davis*, 427 F.3d 197, 208 (3d Cir. 2005), that a plaintiff's mere "complain[t] of pain to unidentified officers who allegedly passed the information" on to the handcuffing officer was insufficient for an excessive force claim.

15

In this appeal, the District Court did not state whether it assumed Williams notified her arresting officers of her pain. Because this fact is plainly material, the Court's failure to state it violated the *Forbes* rule. Instead of remanding, though, we will exercise our authority under *Johnson* to "undertake a . . . review of the record to determine what facts the district court, in the light most favorable to [Williams], likely assumed." *Johnson*, 515 U.S. at 319.

On this record, Williams cannot show her arresting officers received notice of her pain. It's true that Williams denied the Officers' statement that she "never complained at the scene of her arrest about being in pain from handcuffs or otherwise." App. 92a. But her only support for that denial was the dashcam footage, which she said shows she "complain[ed] vociferously about her abuse at the hands of the police." App. 435a. We have reviewed the video footage. *See Scott*, 550 U.S. at 378–81; *Blaylock*, 504 F.3d at 414. It shows Williams complained only about her "wedgie." She said nothing about pain from her handcuffs. Because this evidence is insufficient for a reasonable jury to conclude that the Officers received notice of Williams's pain, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), the District Court erred in denying them qualified immunity for failing to loosen Williams's handcuffs, *see Kopec*, 361 F.3d at 774.

Finally, Williams's allegations that certain unidentified officers put a knee to her back, tripped her, and were "forceful and rough" in handling her cannot survive summary judgment. We reiterate that a "plaintiff alleging that one or more officers engaged in unconstitutional conduct must establish the 'personal involvement' of each named defendant to survive summary judgment and take that defendant to trial." *Jutrowski*, 904 F.3d at 285. In *Jutrowski*, a police officer kicked Jutrowski

16

in the face, breaking his nose and his eye socket. *Id.* at 286. Because Jutrowski was "pinned to the pavement when the excessive force occurred" and was "unable to identify his assailant," he brought excessive force claims against four police officers. *Id.* at 284. Each officer "assert[ed] he neither inflicted the blow himself nor saw anyone else do so." *Id.* And the dashcam footage did not capture the incident. *See id.* at 287. The district court granted summary judgment to all four officers, explaining that because Jutrowski could not "identify which Defendant kicked him," he was asking "the Court to guess which individual Officer Defendant committed the alleged wrong." *Jutrowski v. Twp. of Riverdale*, 2017 WL 1395484, at *4 (D.N.J. Apr. 17, 2017).

On appeal, we rejected Jutrowski's argument that "so long as a plaintiff can show that some officer used excessive force, he may haul before a jury all officers who were 'in the immediate vicinity of where excessive force occurred' without any proof of their personal involvement." *Jutrowski*, 904 F.3d at 289 (citation omitted). After discovery, Jutrowski "still [could not] 'identify the actor that kicked him.'" *Id.* at 292. So we refused to subject to trial "at least three defendants who are 'free of liability.'" *Id.* (quoting *Howell v. Cataldi*, 464 F.2d 272, 283 (3d Cir. 1972)).

*Jutrowski*'s central tenet—that "a defendant's § 1983 liability must be predicated on his direct and personal involvement in the alleged violation"—is "manifest in our excessive force jurisprudence." 904 F.3d at 289. Yet the District Court did not state whether Figge, Monte, or Seitz could have been one of the unidentified officers that allegedly put a knee to Williams's back, tripped her, and were "forceful and rough" in handling her. The Court's failure to address these factual disputes violated the *Forbes* rule, but we will once

17

again "undertake a . . . review of the record to determine what facts the district court, in the light most favorable to [Williams], likely assumed." *Johnson*, 515 U.S. at 319.

The record shows Williams cannot establish the personal involvement of any of the Officers. At summary judgment, Williams conceded she "cannot specifically describe what each officer at the scene of her arrest did." App. 439a, 443a–44a. So the District Court erred in concluding that the Officers are not entitled to qualified immunity for allegedly putting a knee to Williams's back, tripping her, and being "forceful and rough" in handling her. *See Jutrowski*, 904 F.3d at 292.

For all the reasons stated, we will reverse the District Court's denial of summary judgment as to Williams's excessive force claim insofar as it relates to the officers' conduct at the scene of her arrest.

2

At City Hall, Williams claims excessive force because: (1) officers failed to loosen her handcuffs; and (2) an officer twisted her arm, threw her against the wall, and threatened to break her arm.

The District Court identified a genuine dispute of material fact about "whether Sergeant Figge, Officer Monte, or Officer Seitz twisted [Williams's] arm, threw her against a wall, and handcuffed her wrists too tightly at City Hall." *Williams*, 2018 WL 5994603, at *8.

Under *Johnson*, we generally lack jurisdiction to review the genuineness of this kind of dispute. *See* 515 U.S. at 319–

18

20. But having scrutinized the record in this appeal, we conclude the District Court's determination is "blatantly and demonstrably false." Thus, this case—like *Scott*—falls outside *Johnson*'s "outer limit," *Blaylock*, 504 F.3d at 414, and we will exercise jurisdiction to review the genuineness of the factual dispute the District Court identified.

Before discussing the record, we pause to observe that the District Court failed to undertake the kind of "detailed factual description of the actions of each individual defendant" that the *Grant* rule requires. 98 F.3d at 122 (citing *Johnson*, 515 U.S. at 305). The Court determined there is a genuine dispute of material fact about whether Figge, Monte, or Seitz twisted Williams's arm, threw her against a wall, and handcuffed her wrists too tightly at City Hall. But the facts apparently underlying its determination are not specific to any of these officers. Elsewhere in its opinion, the Court says Williams "contends that *officers* twisted her arm, threw her against the wall, and threatened to break her arm if she did not provide it to the officer." *Williams*, 2018 WL 5994603, at *7 (emphasis added). And it says the parties "dispute whether [Williams] notified other *officers* [besides Figge] of her discomfort" in handcuffs. *Id.* at *2, *7 (emphasis added). But facts about what unidentified officers did at City Hall shed no light on what Figge, Monte, or Seitz did there.

Because of this flaw in the District Court's decisionmaking process, the record "quite clearly contradict[s]" its determination that a genuine dispute of material fact exists about whether the Officers twisted Williams's arm, threw her against the wall, or handcuffed her too tightly. *Scott*, 550 U.S. at 378. First and most importantly, in Williams's summary judgment briefing, she conceded she cannot establish that any of the Officers were personally

19

involved in the violations she alleges. There she stated: "While [the Officers] are correct that [she] cannot specifically describe what each officer at City Hall did, she does describe the physical interactions she had with multiple officers at City Hall." App. 455a.

Moreover, Williams's deposition testimony precludes the possibility that any of the Officers are the unidentified officer who allegedly twisted her arm and threw her against a wall. Williams testified that the unidentified officer was not present at her conduct hearing, but both Figge and Monte were there, so that excludes them. And the undisputed record rules out Seitz. Williams testified that the unidentified officer handcuffed her right arm to the bench—not her left arm. But Seitz testified—and Williams confirmed—that he handcuffed Williams's left arm to the bench. In fact, Williams positively identified the unidentified officer as someone other than the Officers she sued here. When Williams was at her mother's house, she saw a picture of the unidentified officer, learned that he goes by the name "Terminator," and later identified him as one Officer Hansel. App. 271a–72a, 290a–91a.

As for the circumstances surrounding Williams's handcuffing, the record shows that Figge could not have handcuffed Williams at City Hall because Seitz handcuffed Williams's left arm, and Figge ordered another officer to handcuff her right arm.

Finally, at oral argument before this Court, Williams's attorney conceded "the basis of any claim against th[e] Officers" for excessive force at City Hall "would be a *failure-to-intervene claim*." Oral Arg. 38:50 (emphasis added). So even Williams's counsel could not defend the genuineness of the factual dispute the District Court identified.

20

For all these reasons, no reasonable juror could find the Officers failed to loosen Williams's handcuffs or twisted her arm, threw her against the wall, and threatened to break her arm. *Anderson*, 477 U.S. at 248. The District Court's contrary determination is unfounded. And because the record shows Williams cannot establish the personal involvement of any of the Officers, the Court erred in concluding they are not entitled to qualified immunity. *See Jutrowski*, 904 F.3d at 292.

Accordingly, we will reverse the District Court's order to the extent it denied summary judgment as to Williams's excessive force claim relative to the officers' conduct at City Hall.

IV

We next consider Williams's claim for false arrest. The District Court erred in concluding that Figge and Seitz are not entitled to qualified immunity on this claim. So we will reverse the Court's denial of summary judgment in relevant part.

On appeal, Figge and Seitz claim they had probable cause to arrest Williams for disorderly conduct and escape. In the alternative, they argue they did not violate clearly established law in arresting Williams. As relevant here, the Court concluded that because "there is a factual dispute regarding exactly when [Williams] stopped at Sergeant Figge's command," it "could not determine if there was sufficient probable cause for criminal escape." *Williams*, 2018 WL 5994603, at *6.

"To state a claim for false arrest under the Fourth Amendment, a plaintiff must establish: (1) that there was an arrest; and (2) that the arrest was made without probable

21

cause." *James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012) (citations omitted). "[P]robable cause exists if there is a fair probability that the person committed the crime at issue." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 467 (3d Cir. 2016) (citations, internal quotation marks, and alterations omitted). "While probable cause to arrest requires more than mere suspicion, the law recognizes that probable cause determinations have to be made on the spot under pressure and do not require the fine resolution of conflicting evidence." *Paff v. Kaltenbach*, 204 F.3d 425, 436 (3d Cir. 2000) (internal quotation marks omitted).

Accepting as true the facts the District Court identified, Figge and Seitz did not violate clearly established law in arresting Williams. Under Pennsylvania law, a person is guilty of escape "if he unlawfully removes himself from official detention," which includes "any . . . detention for law enforcement purposes." 18 PA. CONS. STAT. § 5121 (a), (e). And while Figge and Seitz did not cite Williams for escape, "an arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 584 n.2 (2018) (citations omitted). The determination of whether a person criminally escapes depends on "an evaluation of the specific circumstances" of an individual case. *Com. v. Woody*, 939 A.2d 359, 362 (Pa. Super. Ct. 2007), *aff'd through order* 974 A.2d 1163 (Pa. 2009). And for the specific facts of this case, Pennsylvania law does not clearly establish that Figge and Seitz lacked probable cause to arrest Williams for criminal escape.

On the one hand, in *Commonwealth v. Stewart*, 648 A.2d 797 (Pa. Super. Ct. 1994), a uniformed police officer received a dispatch about a domestic disturbance involving

22

Stewart. *See id.* The officer pulled Stewart over, approached Stewart's vehicle with his gun drawn, and ordered Stewart to put his hands on the dashboard. *See id.* Stewart drove off and was charged and convicted of escape. *See id.* On appeal, Stewart argued that he was not under "detention" within the meaning of the escape statute. *Id.* at 798. The Superior Court of Pennsylvania rejected this argument, holding that because it was "clear that [the officer] exhibited a show of authority," it was "inconceivable that a reasonable person would believe he or she is free to leave." *Id.*; *see also, e.g.*, *Com. v. Fountain*, 811 A.2d 24, 25, 27 (Pa. Super. Ct. 2002) (holding Commonwealth made a *prima facie* case as to escape charge where police officer approached defendant with her canine, told defendant not to run and that she had a warrant for his arrest, and defendant "ran into a residence, and locked the door").

On the other hand, in *Commonwealth v. Woody*, a uniformed police officer in a marked police car instructed Woody, who was fleeing on foot after a traffic stop, to "stop and get on the ground." 939 A.2d at 363. The Superior Court of Pennsylvania determined that Woody was "never officially detained," and vacated his conviction for criminal escape. *Id.*

This case falls in an uncertain space between *Stewart* and *Woody*. Like the officer in *Stewart*, Figge was in uniform and exhibited a show of authority by drawing his gun. And just as Stewart did not comply with the officer's order to put his hands on the dashboard, Williams did not comply with Figge's order to get on the ground. In fact, the parties do not dispute that she ran to the porch of a house and started pounding on the door. But if on-foot flight from a uniformed officer in a marked police vehicle was insufficient for a criminal escape conviction in *Woody*, it may be that probable cause did not exist here. That

23

uncertainty in the law does not strip the officers here of qualified immunity; rather it insulates them from liability for their determination that a "fair probability" existed that Williams committed escape. *Dempsey*, 834 F.3d at 467.

Accordingly, Figge and Monte are entitled to qualified immunity on Williams's claim for false arrest.

\*      \*      \*

For the reasons stated, we will reverse the Court's order denying the Officers summary judgment.