**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 21-2491

———————

FRANK MINOR

v.

DELAWARE RIVER AND BAY AUTHORITY; JAMES N.
HOGAN, Individually and in their official capacity as com-
missioner; JAMES BENNETT, Individually and in their offi-
cial capacity as commissioner; SHEILA MCCANN, Individu-
ally and in their official capacity as commissioner; CEIL
SMITH, Individually and in their official capacity as commis-
sioner; SHIRLEY R. WILSON, Individually and in their offi-
cial capacity as commissioner; SAMUEL E. LATHEM, Indi-
vidually and in their official capacity as commissioner;
CRYSTAL L. CAREY, Individually and in their official ca-
pacity as commissioner; HENRY J. DECKER, Individually
and in their official capacity as commissioner; WILLIAM
LOWE, Individually and in their official capacity as commis-
sioner; JAMES L. FORD, Individually and in their official
capacity as commissioner; MICHAEL RATCHFORD, Indi-
vidually and in their official capacity as commissioner,

Appellants

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 1:19-cv-21343)
District Judge: Joshua D. Wolson

Argued on March 7, 2023

Before: SHWARTZ, BIBAS, and AMBRO, <u>Circuit Judges</u>

(Opinion Filed : June 8, 2023)

William F. Cook [**Argued**]
William M. Tambussi
Brown & Connery
360 North Haddon Avenue
P.O. Box 539
Westmont, NJ 08108

*Counsel for Appellants*

Richard M. Pescatore [**Argued**]
1055 E Landis Avenue
Vineland, NJ 08360

*Counsel for Appellee*

---

OPINION OF THE COURT

---

AMBRO, Circuit Judge

The Delaware River and Bay Authority (DRBA) hired Frank Minor as its Deputy Executive Director in 2009 and terminated him in December 2017. Minor, believing he was fired for his support of then-incoming New Jersey Governor Phil Murphy, sued the DRBA and its Commissioners for violating his First Amendment right to political affiliation.[1] Following discovery, the defendants moved for summary judgment. In that motion, the Commissioners sought qualified immunity. The Court rejected their request. Ruling that a reasonable jury could conclude that Minor's responsibilities were purely administrative by the time he was dismissed, it reasoned that the Commissioners were barred potentially by the First Amendment from firing Minor on account of his politics.

The Commissioners appealed the District Court's ruling under the collateral order doctrine, which allows for appeal of a prejudgment order that (1) conclusively determines a disputed issue, (2) resolves an important question completely separate from the merits of the case, and (3) is effectively unreviewable on appeal from a final judgment. *See Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867 (1994). On appeal, they argue they did not violate a clearly established right when they fired Minor based on his political affiliation

[1] Minor also brought other constitutional and state law claims that are not at issue in this appeal.

3

because that affiliation was necessary for the effective performance of his job as Deputy Director. In other words, the Commissioners contend that the DRBA had an overriding governmental interest in replacing Minor with someone who could further the agency's objectives regardless of Minor's First Amendment rights. Finally, apart from their arguments directed at Minor's job responsibilities, the Commissioners claim the District Court erred by analyzing their entitlement to qualified immunity collectively rather than individually.

The District Court was correct in ruling that the right of certain employees not to be fired based on political affiliation was clearly established. However, because there is a genuine dispute of material fact concerning whether Minor held such a position as Deputy Director, we lack jurisdiction to review the District Court's denial of qualified immunity as to Chairman James Hogan and therefore dismiss the appeal as to his claim. The question of his immunity must await the determination of facts at trial.

The remaining Commissioners may ultimately face the same fate. But first, our precedent requires the District Court to "analyze separately, and state findings with respect to, the specific conduct of each [Commissioner]." *Grant v. City of Pittsburgh*, 98 F.3d 116, 126 (3d Cir. 1996). As no such individualized analysis was performed, we assert limited jurisdiction, vacate the qualified immunity order as it relates to these defendants, and remand for a "careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff)." *Id.* at 122 (citing *Johnson v. Jones*, 515 U.S. 304, 311 (1995)). To aid our review, we need to learn more about whether each Commissioner could "know that his

4

or her specific conduct violated clearly established rights." *Id.* at 121 (emphasis omitted) (citing *Anderson v. Creighton*, 483 U.S. 635, 636–37 (1987)). An individualized analysis will provide that information.

# I. BACKGROUND

## A. Factual Background

The DRBA is a bi-state agency created by interstate compact between Delaware and New Jersey. It is charged with the operation of several vital transportation assets between both states, and with furthering economic development in Delaware and the four southern counties of New Jersey.

The DRBA's Board of Commissioners consists of twelve Commissioners, six each from New Jersey and Delaware. The DRBA also has a Deputy Executive Director—a position historically appointed by the Commissioners. On paper, the Deputy Director "serves in a key leadership role with the Executive Director [to] ensur[e] that the core mission of the [DRBA] is achieved," and "is essential to and has the primary responsibility for all [DRBA]-related economic development." JA 308. In reality, evidence suggests that the Deputy Director does "very little" and is "not a policymaking position." JA 13 (Op. at 9); JA 1698. Former DRBA Executive Director Scott Green testified to that effect at Minor's separate unemployment proceeding, explaining that the Deputy Director position was created by "stitching together a number of things people thought were not important." JA 240; *see also* JA 802.

The DRBA appointed Frank Minor as Deputy Director in April 2009. Over time, his working relationship with the

Board soured.  Defendants[2] blame this deterioration on Minor's poor communication, bad performance, and absenteeism.  Whatever the cause, Minor's falling out with the Board coincided with a marked degradation of his already circumscribed responsibilities.  By 2017, he (1) did not have the authority to hire, fire, or promote, (2) could not discipline employees, (3) had no say in budgeting processes, (4) had no authority to enter into contracts on behalf of the DRBA, and (5) could not attend meetings without the express consent of the Executive Director.  It was "difficult [for the DRBA] to come up with enough duties" for Minor, JA 1609, and the seven direct reporting employees first assigned to him were reduced to one administrative assistant by 2017.

That year, while still employed by the DRBA, Minor supported Phil Murphy in his run for Governor of New Jersey through fundraising and other efforts.  When Governor Murphy won the election, he appointed Minor to his transition team.  This caused problems for Minor because Governor Murphy was a political rival of New Jersey State Senate President Stephen Sweeney, who was close with DRBA Chairman Hogan.  When Minor learned of Senator Sweeney's displeasure at his joining Governor Murphy's transition team, he resigned

---

[2] The DRBA, also included for convenience in this opinion as a defendant, argues that it is a "necessary party" to the appeal because "if qualified immunity is granted, all federal claims will be dismissed, thus divesting the District Court of any jurisdiction to review a remaining state law claim against DRBA for breach of contract."  Opening Br. 1–2.  Because we lack jurisdiction to review the District Court's denial of qualified immunity as it relates to Chairman Hogan, we do not consider the DRBA's "necessary party" argument.

from that group. But, according to Minor, the damage was already done, and Senator Sweeney urged Hogan to terminate Minor before Governor Murphy could be sworn in and veto the DRBA's decision.

On December 19, 2017, the DRBA passed two resolutions terminating Minor. Resolution 17-66 stripped employment tenure from the Deputy Director position. And Resolution 17-67, which turned on the passage of Resolution 17-66, terminated Minor by asserting a loss of confidence by the Commissioners. Minor insists that this termination, in fact, owed to his support of Governor Murphy and his misalignment with State Senator Sweeney. The record lends some support to this view: "On the morning the [C]ommissioners voted to terminate [] Minor, Senator Sweeney's long-time attorney called [] Minor before the vote to tell him not to come into work because the [C]ommissioners were going to terminate him later that morning. Then, shortly after the [C]ommissioners voted to terminate [] Minor, [] Hogan called Senator Sweeney to let him know." JA 9 (Op. at 5); *see, e.g.*, JA 239, 1798, 1807.

## B. Procedural Background

Following his termination, Minor sued the DRBA and its individual Commissioners, asserting (1) a First Amendment claim for violating his rights to political affiliation, (2) a Fourteenth Amendment due process claim, (3) a breach-of-contract claim, and (4) a claim for municipal liability under 42 U.S.C. § 1983. The defendants moved to dismiss the entire suit, but the District Court excised only Minor's due process claim.

The parties then engaged in discovery, and the defendants moved for summary judgment on Minor's three remaining

7

claims. That motion succeeded only as to the § 1983 cause of action for municipal liability against the DRBA. The Court denied summary judgment as to the remaining claims and refused to extend qualified immunity to the individual Commissioners. Thereafter, the defendants filed this appeal challenging the denial of qualified immunity.

## II. DISCUSSION[3]

### A. Qualified Immunity and the Collateral Order Doctrine

We start by canvassing familiar principles of qualified immunity. That doctrine shields officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "To resolve a claim of qualified immunity, [we] engage in a two-pronged inquiry: (1) whether the plaintiff sufficiently alleged the violation of a constitutional right, and (2) whether the right was clearly established at the time of the official's conduct." *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 241 (3d Cir. 2016) (cleaned up). A "clearly established right" must be so clear that every "reasonable official would [have understood] that what he is doing violates that right." *Anderson*, 483 U.S. at 640; *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (observing that we do not charge officials with

---

[3] The District Court had jurisdiction under 28 U.S.C. § 1331. To the extent we have jurisdiction, we have it pursuant to 28 U.S.C. § 1291 and the collateral order doctrine, and we review questions of law anew. *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 985 (3d Cir. 2014).

understanding a clearly established right unless existing precedent has "placed the statutory or constitutional question beyond debate"). "[C]learly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a robust consensus of cases of persuasive authority in the Courts of Appeals." *Bland v. City of Newark*, 900 F.3d 77, 84 (3d Cir. 2018) (cleaned up). We therefore start by looking to analogous precedents of the Supreme Court and the Third Circuit. *See L.R.*, 836 F.3d at 247–48. Then, we examine persuasive authorities, such as rulings from other Courts of Appeals. *See id.*

Certain orders that deny a defendant's motion for summary judgment on qualified immunity are appealable under 28 U.S.C. § 1291 because it "is an immunity from suit rather than a mere defense to liability and is effectively lost if a case is erroneously permitted to go to trial." *Forbes v. Twp. of Lower Merion*, 313 F.3d 144, 147 (3d Cir. 2002) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526–27 (1985)) (cleaned up). Our review is limited to issues of law, though. If the denial of qualified immunity turns on a genuine issue of fact, we lack jurisdiction to review the qualified-immunity order. *See Johnson*, 515 U.S. at 319–20; *Doe v. Groody*, 361 F.3d 232, 237 (3d Cir. 2004). Crystallizing this distinction, we have explained that

> we may review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right, but we may not consider whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove. When a defendant argues that a trial judge erred in denying a qualified-immunity summary-

> judgment motion because the judge was mis-
> taken as to the facts that are subject to genuine
> dispute, the defendant's argument cannot be en-
> tertained under the collateral-order doctrine but
> must instead await an appeal at the conclusion of
> the case.

*Forbes*, 313 F.3d at 147–48 (quoting *Ziccardi v. City of Phila.*, 288 F.3d 57, 61 (3d Cir. 2002)) (cleaned up); *see also James v. N.J. State Police*, 957 F.3d 165, 167 (3d Cir. 2020) (observing that we "lack jurisdiction to review the District Court's deter-mination that a factual dispute is genuine, but we have juris-diction to consider whether the disputed fact is material to the issue on which a party sought summary judgment").

Recognizing that "it is often a difficult endeavor for a court of appeals to try to separate an appealed order's reviewable de-termination (that a given set of facts violates clearly established law) from its unreviewable determination (that an issue of fact is 'genuine')," *Blaylock v. City of Phila.*, 504 F.3d 405, 409 (3d Cir. 2007) (quoting *Johnson*, 515 U.S. at 319), "two supervi-sory rules" aid our review of orders that deny a defendant's motion for summary judgment on qualified immunity grounds. *Williams v. City of York*, 967 F.3d 252, 254–55 (3d Cir. 2020).

First, *Forbes* requires district courts "to specify those ma-terial facts that are and are not subject to genuine dispute and explain their materiality." 313 F.3d at 146. This requirement reflects our understanding that because the "scope of our juris-diction to review [a district court's decision denying summary judgment] depends upon the precise set of facts that the District Court viewed as subject to genuine dispute," we are "hard pressed to carry out our assigned function" when district courts

10

do not specify the set of facts on which they rely.[4]  *Id.* at 146, 148.

Second, following *Grant*, we require courts to "analyze separately, and state findings with respect to, the specific conduct of each [defendant]."  98 F.3d at 126.  This "ensure[s] that district courts enforce the tenet . . . that a 'plaintiff alleging that one or more [state] officers engaged in unconstitutional conduct must establish the personal involvement of each named defendant to survive summary judgment and take that defendant to trial.'"  *Williams*, 967 F.3d at 257–58 (quoting *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 285, 289 (3d Cir. 2018)).

When presented with an interlocutory appeal in which a district court elides these supervisory rules, "we . . . remand[.]"  *Blaylock*, 504 F.3d at 410.

## B. Minor's First Amendment Claim and the *Elrod-Branti* exception

In reviewing the District Court's denial of qualified immunity, we also examine the substance of Minor's constitutional claim.  To prevail on his First Amendment political affiliation claim, Minor must show that (1) he was employed at a public agency in a position that does not require political affiliation, (2) he was engaged in constitutionally protected conduct, and (3) the conduct was a substantial or motivating factor

---

[4] "While it is true that [Supreme Court precedent] contemplates that we may review the record ourselves, [*Johnson*, 515 U.S. at 319], *Forbes* reduces the frequency with which we take on this 'cumbersome' task and allows us the alternative of vacating and remanding."  *Williams*, 967 F.3d at 258.

in the government's decision to terminate him.  *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 271 (3d Cir. 2007).  Of these three elements, the parties spar only over the first—whether Minor was employed in a position that did not require political affiliation.  *See, e.g.*, Opening Br. 21–30.

On this point, "[a]dverse employment actions against government employees that are based on political affiliation are, as a general rule, prohibited."  *Armour v. Cnty. of Beaver*, 271 F.3d 417, 427 (3d Cir. 2001) (collecting cases).  But a narrow and important exception—the *Elrod-Branti* exception—exists "for particular positions for which political affiliation is found to be an appropriate requirement."  *Id.* at 428.  "The notion of what constitutes a position for which political affiliation may acceptably be required has developed over time."  *Id.*  Initially, in *Elrod v. Burns* the Supreme Court adopted an approach that distinguished between policymaking and non-policymaking positions.  *See* 427 U.S. 347, 367 (1976) ("Limiting patronage dismissals to policymaking positions is sufficient to [further government effectiveness and efficiency].  Nonpolicymaking individuals usually have only limited responsibility and are therefore not in a position to thwart the goals of the in-party.").  Following suit, we held that policymaker status itself—not the factors it comprises—presented a question of fact.  *See Rosenthal v. Rizzo*, 555 F.2d 390, 393 n.5 (1977) ("[T]he determination of status as a policymaker vel non presents a difficult factual question.").

However, the Supreme Court soon grew "dissatisfied" with *Elrod*'s "categorical" approach and shifted focus to "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."  *Boyle v. Cnty. of Allegheny*, 139 F.3d

12

386, 395 (3d Cir. 1998) (citing *Branti v. Finkel*, 445 U.S. 507, 518 (1980)). Again following suit, we reaffirmed that "whether an employee falls within the *Elrod/Branti* exception is generally one of fact." *Id.* at 397. Yet we clarified that "the ultimate inquiry is not whether the label 'policymaker' . . . fits a particular position," *id.* at 395 (quoting *Branti*, 445 U.S. at 518), but rather whether an employee (1) has duties that are non-discretionary or non-technical, (2) participates in discussions or other meetings, (3) prepares budgets, (4) possesses the authority to hire and fire other employees, (5) has a high salary, (6) retains power over others, and (7) can speak in the name of policymakers. *Galli*, 490 F.3d at 271 (citing *Brown v. Trench*, 787 F.2d 167, 169 (3d Cir. 1986)). Most important to this holistic analysis, we explained, is "whether [an employee] has meaningful input into decisionmaking concerning the nature and scope of a major [] program." *Id.* (quoting *Armour*, 271 F.3d at 429). A person who holds an administrative role but lacks authority to give such input will not suffice.

Against this backdrop, we first determine whether the District Court correctly ruled that the individual defendants may have been "on notice that their conduct violate[d] established law," such that they were not entitled to qualified immunity on a motion for summary judgment. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see, e.g.*, *Assaf v. Fields*, 178 F.3d 170, 177 (3d Cir. 1999) (citing *Burns v. Cnty. of Cambria*, 971 F.2d 1015, 1024 (3d Cir. 1992)). Although we are mindful of our obligation not to "define clearly established law at a high level of generality," *al-Kidd*, 563 U.S. at 742, we cannot ignore the dictates of our precedent, which clearly establishes Minor's right not to be terminated from a job without any real responsibility on account of his political affiliation. *See, e.g.*, *Galli*, 490 F.3d at 271.

13

Consistent with this precedent, the District Court identified material facts that, if proven, are "sufficient to establish a violation of a clearly established constitutional right." *Forbes*, 313 F.3d at 147 (quoting *Ziccardi*, 288 F.3d at 61). It pointed to evidence showing that politics played a role in Minor's firing. *See, e.g.*, JA 9 (Op. at 5) ("[S]hortly after the [C]ommissioners voted to terminate Mr. Minor, Mr. Hogan called Senator Sweeney to let him know."). It identified portions of the record showing that Minor's job responsibilities had been gutted by December 2017. *See, e.g.*, JA 12 (Op. at 8) (noting that Minor had been stripped of direct reports, lacked authority over budgets, could not hire or fire employees, and was performing clerical tasks by the time he was terminated). And it highlighted statements by Chairman Hogan showing his awareness that the Deputy Director role had become a job with minimal duties by the time Minor was fired—a view that was apparently widely held. *See, e.g.*, JA 12–13 (Op. at 8–9) (noting that Chairman Hogan "recounted that it was 'commonly said' that the [Deputy Director position] wasn't a real job but rather 'was a ginned up job to make a political deal'"). If proven, these facts would show the Deputy Director job was a position from which one could not be fired because of political affiliation.

Because these disputed facts are material to the question of whether the Deputy Director job is one for which political affiliation can be a basis for termination, we decline to exercise jurisdiction over defendants' arguments "that [the] trial judge . . . was mistaken as to the facts that are subject to genuine dispute." *Compare Forbes*, 313 F.3d at 147, *with* Opening Br. 29.

While we decline to exercise jurisdiction over the order denying Chairman Hogan's motion for summary judgment based on qualified immunity, we note that, per *Grant*, the Court needed to conduct a "careful examination of the record . . . to establish . . . a detailed factual description of the actions of each [remaining] individual defendant (viewed in a light most favorable to the plaintiff)." 98 F.3d at 122. This ensures that every named defendant is personally involved in an alleged violation before being put through the burden of trial.[5]

Here, the Court analyzed the remaining defendants generally. *See, e.g.*, JA 14 (Op. at 10) ("Less than a month after the media reported Mr. Minor would join Governor Murphy's transition team, the DRBA [C]ommissioners voted to terminate him."); JA 21 (Op. at 17) ("Minor was not in a policymaking position, and the DRBA's leadership terminated him for his political affiliations with Governor Murphy."). We must therefore remand the case to allow the District Court to perform the necessary individual analysis. On remand, circumstantial evidence might reasonably lead the Court to conclude that the remaining Commissioners *each* voted to terminate Minor due to his political affiliation with Governor Murphy. Or it may take an alternative reading of the record. *See, e.g.*, JA 172 (citing Ex. D-28, Response of Commissioner Henry Decker to Plaintiff's Interrogatory No. 12) ("I had no knowledge of [Minor's] political involvement or affiliation with Governor

---

[5] We have often applied *Grant*'s supervisory rule strictly. *See, e.g.*, *Rouse v. Plantier*, 182 F.3d 192, 200 (3d Cir. 1999). Yet on occasion we have relaxed it when individual defendants act in unison. *See, e.g.*, *Cole v. Encapera*, 758 F. App'x 252, 255 (3d Cir. 2018) (nonprecedential). We express no view on this limited exception, which was not raised by the parties.

Murphy. Since I was unaware of any such political involvement, it was not a factor."). In any event, the District Court is best suited to perform this task in the first instance.

* * *

Because there are material facts in dispute, we cannot say as a matter of law that the Deputy Director position is one for which political affiliation is an appropriate requirement. This means we lack jurisdiction to review Chairman Hogan's appeal and will dismiss it. *James*, 957 F.3d at 167.[6] We assert limited jurisdiction to vacate and remand the Court's qualified immunity order as it relates to the remaining Commissioners. *Grant* requires a separate analysis for each individual defendant and one was not performed. 98 F.3d at 126.

---

[6] Because the District Court has federal question jurisdiction, we reject the defendants' request to remand with instructions to dismiss Minor's breach-of-contract claim for lack of supplemental jurisdiction.