PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———

No. 18-2856
———

WILL EL, an adult individual;
BEYSHAUD EL, an adult individual

v.

CITY OF PITTSBURGH, a municipal Corporation;
REYNE KACSUTA, Individually, and in her official
capacities, as a police officer of the City of Pittsburgh;
FRANK WELLING, Individually, and in his official
capacities, as a police officer of the City of Pittsburgh; RYAN
WARNOCK, Individually, and in his official capacities, as a
police officer of the City of Pittsburgh; DISTRICT
ATTORNEY ALLEGHENY COUNTY


Frank Welling;
Reyne Kacsuta;
Ryan Warnock,
                    Appellants
———

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-15-cv-00834)

District Judge:  Honorable Nora B. Fischer

_____

Argued April 24, 2020
Before:  PHIPPS, RENDELL and FISHER, *Circuit Judges*.

(Filed:  September 16, 2020)

Yvonne S. Hilton
Julie E. Koren  *[ARGUED]*
City of Pittsburgh
Department of Law
414 Grant Street
313 City County Building
Pittsburgh, PA 15219
    *Counsel for Appellants*

Todd J. Hollis  *[ARGUED]*
Hollis Law Offices
428 Forbes Avenue, Suite 505
Pittsburgh, PA 15219
    *Counsel for Appellees*

_____

OPINION OF THE COURT

_____

FISHER, *Circuit Judge*.

On a summer day in 2013, brothers Will and Beyshaud El left a corner store in their neighborhood and encountered Pittsburgh Police Lieutenant Reyne Kacsuta. The men were unarmed and were not committing a crime. Nor did they flee

2

or resist Lieutenant Kacsuta or the five other officers who quickly joined her. Nevertheless, the incident ended with Officer Frank Welling slamming Will against a building and taking him to the ground, and Officer Ryan Warnock deploying his taser on Beyshaud.

The brothers were convicted in state court of summary disorderly conduct and summary harassment. They then sued Lieutenant Kacsuta and Officers Welling and Warnock in federal court, asserting Fourth Amendment excessive force claims and state law assault and battery claims. The officers moved for summary judgment, which the District Court granted in part and denied in part. The officers appeal. We will reverse the denial of summary judgment as to Lieutenant Kacsuta and affirm the denial of summary judgment as to Officer Welling. Because we lack jurisdiction to consider whether the District Court erred in denying the motion as to Officer Warnock, we will dismiss the appeal in part.

## I.

### A. Factual History

On July 2, 2013, Lieutenant Kacsuta was in her cruiser outside a convenience store in the Homewood neighborhood of Pittsburgh. She saw Beyshaud and Will El leaving the store and thought that Beyshaud was holding "a green foil object." *El v. City of Pittsburgh*, No. CV 15-834, 2018 WL 3707420, at *3 (W.D. Pa. Aug. 3, 2018). Lieutenant Kacsuta suspected that the object was synthetic marijuana, which reportedly was being sold out of the store. She drove up to the brothers and asked to speak to them, but they declined and walked away. With her suspicions further heightened, she turned her car around to follow them.

Knowing that Officers Warnock and Welling were nearby, Lieutenant Kacsuta called for backup. Then she got out

3

of her car and approached the brothers. They obeyed her direction to sit down on the stoop of a vacant storefront, and, at her request, Will gave her his identification. Will then emptied his pockets onto the sidewalk and directed Beyshaud to do the same because he wanted Lieutenant Kacsuta to know that "they did not have anything on them and they were not doing anything." *Id.*

The brothers did not have synthetic marijuana, but Lieutenant Kacsuta thought they had left the store with a tobacco product. Although Beyshaud was 18 years old, he did not have identification—and without proof of his age, Lieutenant Kacsuta suspected he might have made an underage tobacco purchase. (Will's identification, which he had showed the lieutenant, confirmed he was over 18.)

Officers Warnock and Welling arrived in less than two minutes. *Id.* at *4. Neither of them knew why the Els were detained, and Lieutenant Kacsuta did not direct them to make sure the brothers remained seated. "Ultimately, five . . . officers [including Warnock and Welling] reported to the scene." *Id.* A dashboard camera in one of the squad cars recorded video of what happened next. The camera captured clear images, and the resulting video has been exceedingly helpful as we have studied the events at the heart of this case. *See* JA72 (Video). The camera's microphone picked up only muffled and partial audio, *see id.*—but those involved subsequently testified about was said, and their testimony does not conflict with one another or with the video.

With the Els sitting on the storefront stoop, Lieutenant Kacsuta picked up Will's identification from the ground, looked at it, and tossed it back on the ground. Beyshaud reached for his brother's identification, but Lieutenant Kacsuta

4

stepped on it, preventing him from picking it up. The Els complained that they were being harassed.

Will testified that in response to his comment about being harassed, Officer Welling said, "[D]o you want to know what it feels like to be harassed?" *Id.* Will stood up to, as he testified, "make sure the lieutenant heard what [Officer Welling] said to me." JA360. The video shows Will talking to Officer Welling as each of the men gestured with a pointed forefinger. The events that happened next cascaded quickly and were over in about ten seconds.

Will "took one or two small steps in the direction of Lieutenant Kacsuta and Officer Warnock." *El*, 2018 WL 3707420, at *4. Officer Welling then "grabbed Will . . . by his wrist and neck and slammed him back into the wall of the vacant storefront . . . and on to the pavement." *Id.* Beyshaud, who had still been sitting on the stoop, "immediately stood up, turned towards Officer Welling, and attempted to punch [him] and otherwise defend his brother." *Id.* Officer Warnock reacted to Beyshaud's swing by "deploy[ing] his taser into Beyshaud['s] side . . . , causing Beyshaud . . . to fall to the ground." *Id.*

When the dust settled, both brothers were lying on the ground. They did not resist as six officers handcuffed and arrested them. Beyshaud was taken to the hospital and then to jail. Will went directly to jail and, after he was released, visited the hospital emergency department for lower back pain. He was told he had a contusion on his hip.

The Allegheny County District Attorney initially charged Will and Beyshaud with aggravated assault of a police officer but later amended the charges to summary disorderly conduct against Will, 18 Pa. Cons. Stat. § 5503(a)(4), and summary harassment against Beyshaud, *id.* § 2709(a)(1). The

5

brothers were tried jointly in the Allegheny County Court of Common Pleas without a jury and were convicted. Neither appealed his conviction, so the Common Pleas judgments are valid and final.

## B. Procedural History

In 2015, the Els sued the City of Pittsburgh and several police officers, including the three appellants: Lieutenant Kacsuta, Officer Welling, and Officer Warnock. The complaint asserted a 42 U.S.C. § 1983 claim for excessive force in violation of the Fourth Amendment and a state law claim for assault and battery.[1] In early 2018, after discovery, the defendants filed a motion for summary judgment. On the § 1983 excessive force claim, the defendants argued that they did not use excessive force, and if they did, they were entitled to qualified immunity. On the state law assault and battery claim, the defendants argued that for the same reasons the force was not excessive, there was no assault and battery. The District Court granted the motion as to the state law claim against Lieutenant Kacsuta, and granted it in part and denied it in part as to the § 1983 excessive force claim against her. Conversely, the District Court denied the motion as to the state law claim against Officer Warnock but granted it as to the § 1983 excessive force claim against him. Finally, the District Court denied the motion as to both claims against Officer Welling. The officers appeal.

---

[1] The Els also brought a claim against the city for failure to properly train, supervise, and reprimand Lieutenant Kacsuta. The District Court granted summary judgment for the city on this claim, *El*, 2018 WL 3707420, at *14-15, and it is not at issue in this appeal.

## II.

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367. We have jurisdiction under 28 U.S.C. § 1291 to consider "'a district court's denial of a claim of qualified immunity, *to the extent that it turns on an issue of law*," because it "is an appealable final decision' under the collateral order doctrine."[2] *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 61 (3d Cir. 2002) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). When we review a denial of summary judgment based on qualified immunity and there is a video in the record "capturing the events in question," we must accept the trial court's factual determinations unless they are "blatantly contradicted" by the video. *Scott v. Harris*, 550 U.S. 372, 378, 380 (2007); *see also Blaylock*, 504 F.3d at 409 (where a district court "determines 'that there is sufficient record evidence to support a set of facts under which there would be no immunity,' we must accept that set of facts on interlocutory review" (quoting *Schieber v. City of Philadelphia*, 320 F.3d 409, 415 (3d Cir. 2003))). "Once we accept the set of facts that the District Court found to be sufficiently supported, . . . we may review the District Court's conclusion that the defendants would not be immune from liability if those facts were proved at trial." *Id.* Our review of these questions of law is plenary. *Schieber*, 320 F.3d at 415.

---

[2] The collateral order doctrine provides that an order is final and appealable under 28 U.S.C. § 1291 "if it: '(1) conclusively determine[s] the disputed question, (2) resolve[s] an important issue completely separate from the merits of the action, and (3) [is] effectively unreviewable on appeal from a final judgment.'" *Blaylock v. City of Philadelphia*, 504 F.3d 405, 408 (3d Cir. 2007) (alterations in original) (quoting *Johnson v. Jones*, 515 U.S. 304, 310 (1995)).

This appeal also requires us to consider our own jurisdiction, which we always have jurisdiction to do and which we review on a plenary basis. *In re Lipitor Antitrust Litig.*, 855 F.3d 126, 142 (3d Cir. 2017), *as amended* (Apr. 19, 2017) (quoting *United States v. Ruiz*, 536 U.S. 622, 628 (2002)).

We lack jurisdiction to consider Officer Warnock's argument that the District Court erred in denying his summary judgment motion on the state law claim. In the District Court, Officer Warnock and the other officers argued that they were entitled to summary judgment on the state law claim because the force they used was "reasonable and necessary and did not rise to the level of assault and battery." District Ct. Docket 106 at 2, ¶ 7. They invoked neither Pennsylvania official immunity under 42 Pa. Cons. Stat. § 8546 nor qualified immunity.[3] A denial of qualified immunity would have been an appealable final order, *Ziccardi*, 288 F.3d at 61, and we have similarly held that a denial of state immunity is an appealable final order under the collateral order doctrine, *Rivas v. City of Passaic*, 365 F.3d 181, 193 (3d Cir. 2004). But, because there was no denial of federal or state immunity, there was no immediately appealable order. We therefore lack jurisdiction to address the denial of summary judgment on the state law claim.

---

[3] Had the officers raised qualified immunity as a defense to the state-law claims, the argument would have failed, because qualified immunity is a defense only to violations of federal law under § 1983. Immunity from state law claims is governed by the state's immunity doctrine. *In re City of Phila. Litig.*, 49 F.3d 945, 957 (3d Cir. 1995).

8

III.

"Police officers, embodying the authority of the state, are liable under [42 U.S.C.] § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity." *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007). In the familiar qualified immunity analysis, the court asks "(1) whether the officer violated a constitutional right, and (2) whether the right was clearly established, such that 'it would [have been] clear to a reasonable officer that his conduct was unlawful.'" *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011) (alteration in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009)). The court may address the steps in either order. *Pearson*, 555 U.S. at 236.

When considering whether a right was clearly established, our "focus is on whether the officer had fair notice that her conduct was unlawful," so "reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). Although there need not be "a case directly on point for a right to be clearly established, existing precedent must have placed the . . . constitutional question beyond debate." *Id.* (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)).

Here, the District Court ruled that Lieutenant Kacsuta was not entitled to immunity with respect to part of the § 1983 excessive force claim against her, and that Officer Welling was not entitled to immunity with respect to the entirety of the

9

excessive force claim against him.[4] We now explain why we will reverse as to Lieutenant Kacsuta and affirm as to Officer Welling.

## A. Section 1983 claim against Lieutenant Kacsuta

The excessive force claim against Lieutenant Kacsuta is, specifically, a failure to intervene claim. It is predicated on the allegation that she did not stop Officers Warnock and Welling from using force on the El brothers. "[A] police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force," but only "if there is a realistic and reasonable opportunity to intervene." *Smith v. Mensinger*, 293 F.3d 641, 650-51 (3d Cir. 2002). Naturally

---

[4] The officers argue that "[t]he District Court erred by wading into the first prong of a qualified immunity [analysis] only to determine [that] the question of [whether the force was excessive] should be left to a jury." Appellants' Br. 13; *see also* Reply Br. 7-9. This seems to boil down to a quibble with the Court's phrasing. For each defendant, at the first step of the qualified immunity analysis, the Court considered whether "a reasonable factfinder could conclude" there was a constitutional violation. *El*, 2018 WL 3707420, at *11; *see also id.* at *12, 13. That is not error. It is simply another way of saying that, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right"—which is precisely what a court is required to determine at this step of the analysis. *Saucier*, 533 U.S. at 201; *see also Ziccardi*, 288 F.3d at 60 (affirming denial of qualified immunity where, as here, the district court "held that a reasonable jury could find" that the defendants violated the plaintiff's constitutional rights, and that the right was "clearly established" (internal quotation marks and citation omitted)).

enough, the duration of the incident is key to determining whether there was a reasonable opportunity. There may be a genuine issue of fact regarding a reasonable opportunity to intervene where the allegedly excessive force lasts about fifteen minutes, *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995), or where the event unfolds in multiple stages, *Smith*, 293 F.3d at 644, 650 (plaintiff's testimony created dispute of material fact where he alleged he was "rammed . . . into walls[,] . . . knocked . . . to the floor[,] . . . kicked and punched[,] . . . pulled . . . to his feet," and beaten some more (internal quotation marks omitted)). By contrast, where an incident is momentary, its "brevity" may "defeat[] [a] . . . failure-to-intervene claim." *Ricks v. Shover*, 891 F.3d 468, 479 (3d Cir. 2018) (no failure-to-intervene claim against a prison supervisor where a guard allegedly made brief sexual contact with an inmate, which had ended by the time the inmate called for help).

The District Court granted Lieutenant Kacsuta's summary judgment motion for her alleged failure to prevent the tasing of Beyshaud because it was "quick, five seconds, and without warning," so "a reasonable factfinder could not conclude that Lieutenant Kacsuta had a reasonable opportunity to intervene." *El*, 2018 WL 3707420, at \*13. However, the Court denied summary judgment for her failure to intervene in taking Will down. It held that "a reasonable factfinder could conclude that Lieutenant Kacsuta, mere feet away from Officer Welling[,] . . . passively watched" and "elected not to" intervene, and that she "stepped away from the altercation at one point." *Id.* The District Court also ruled that "it was clearly established on July 2, 2013, that when a fellow officer employs excessive force during an arrest or investigatory stop, failing to intervene violates the suspect's constitutional rights." *Id.*

11

We conclude that the video "blatantly contradict[s]" the District Court's finding regarding the failure to intervene claim. *Scott*, 550 U.S. at 380. As Officer Welling took Will down, Lieutenant Kacsuta took a few steps toward them and then a few steps back, all within a matter of roughly five seconds and while Officer Warnock, standing next to her, deployed his taser on Beyshaud. JA72 (Video at 13:47:05-10). Given the speed with which the incident ended, no reasonable jury could conclude that Lieutenant Kacsuta had a realistic and reasonable opportunity to intervene. *See Williams v. City of York*, 967 F.3d 252, 258 (3d Cir. 2020) ("[W]here the trial court's determination that a fact is subject to reasonable dispute is *blatantly and demonstrably false*, a court of appeals may say so, even on interlocutory review." (quoting *Blaylock*, 504 F.3d at 414)). This fact pattern is more akin to *Ricks*, where the use of force was momentary. 891 F.3d at 472, 479. It is less like *Baker*, 50 F.3d at 1193-94, and *Smith*, 293 F.3d at 644, 652, where a use of force lasted long enough to create a genuine issue of fact regarding whether there was an opportunity to intervene.

The Els argue that the "entire incident" lasted about twenty minutes, and therefore Lieutenant Kacsuta could have intervened. Appellees' Br. 24. However, the question is not whether she had an opportunity to intervene in the "entire incident," but in Officer Welling's use of force, which lasted about five seconds. She did not, so the District Court erred in denying her motion for summary judgment based on qualified immunity.[5]

---

[5] Having concluded there was no constitutional violation, we do not assess the other step of the qualified immunity analysis: "whether the right was clearly established." *Lamont*, 637 F.3d at 182.

B. Section 1983 claim against Officer Welling

The excessive force claim against Officer Welling is predicated on his grabbing Will by the wrist and neck, slamming him back into the wall of the vacant storefront, and taking him to the ground. "To prevail on a Fourth Amendment excessive-force claim, a plaintiff must show that a seizure occurred and that it was unreasonable under the circumstances." *Lamont*, 637 F.3d at 182-83. "A seizure occurs '[w]henever an officer restrains the freedom of a person to walk away.'" *Rivas*, 365 F.3d at 198 (alteration in original) (quoting *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)). There is no dispute that there was a seizure here; the question is whether it was reasonable.

When determining the reasonableness of an allegedly excessive use of force, "the standard is whether the police officer's 'actions [were] objectively reasonable in light of the facts and circumstances' . . . , regardless of the officer's intent or motivation." *Id.* (first alteration in original) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). We consider factors including "the severity of the crime at issue, whether the suspect[s] pose[] an immediate threat to the safety of the officers or others, and whether [they are] actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. We also assess the physical injury to the plaintiff, "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997), *abrogated on other grounds by Curley*, 499 F.3d at 209-11.

13

The District Court found that Will's actions—"standing up and taking one or two small steps towards Lieutenant Kacsuta, located a few feet away"—were "not performed in a threatening manner," taking place as they did during "an investigatory stop first for suspicion of possession of synthetic marijuana and then for illegal sale/possession of cigarettes." *El*, 2018 WL 3707420, at \*11. "Accordingly," the Court held, "a reasonable factfinder could conclude" that Officer Welling "grabbing Will . . . by [the] wrist and neck and slamming him into the wall of the vacant storefront and on to the pavement was unreasonable and constituted an excessive use of force" in violation of the Fourth Amendment. *Id.* The District Court then concluded that case law clearly established an individual's "right to be free from the use of excessive force by police" where, "during an investigatory stop for a minor offense, [he] stands up and takes one or two small steps towards a police officer, standing a few feet away, in a non-threatening manner." *Id.*

The District Court relied on a broader set of opinions than it should have when determining that the right was clearly established. Nevertheless, we will affirm because the right was clearly established by applicable case law and a reasonable jury could conclude it was violated.

### 1. Violation of a constitutional right

Officer Welling argues that the District Court's definition of the right was erroneous because Will's conduct was not necessarily non-threatening: after standing up, he did not sit down when officers directed him to, and he "point[ed] at various people in a vigorous manner." Appellants' Br. 23. The thrust of this argument seems to be that "the situation was tense and uncertain" and that the District Court erroneously concluded there was a genuine issue of material fact regarding

14

whether Will's conduct was threatening. Appellants' Br. 24. "[W]e generally lack jurisdiction to review the genuineness of this kind of [factual] dispute" on interlocutory appeal from a denial of immunity. *Williams*, 967 F.3d at 262.

Although we would not be required to defer to the District Court if the video showed its conclusion was "blatantly and demonstrably false," *id.* (quoting *Blaylock*, 504 F.3d at 414; emphasis omitted), the District Court's finding that Will was non-threatening is not blatantly contradicted by the video, *see* JA72 (Video at 13:45:48-13:47:13). The video clearly shows what happened between the police and the Els, and we have studied it extensively. Indeed, viewing the facts in "the light depicted by the video[]," *Scott*, 550 U.S. at 381, confirms that the District Court did not make any demonstrably false findings about how the events unfolded. *See* JA72 (Video at 13:45:58-13:50:00).

The District Court correctly concluded that, taking the facts in the light most favorable to Will, a jury could conclude there was a violation of his right to be free from the unreasonable use of force. The factors laid out in *Graham v. Connor*, 490 U.S. at 386, and *Sharrar*, 128 F.3d at 822, show why. Under the *Graham* factors, the potential crime at issue (underage purchase of tobacco) was not severe; the Els did not pose an immediate safety threat; and they were neither resisting arrest nor trying to flee. *See* 490 U.S. at 396. Under the *Sharrar* factors, the Els were not violent or dangerous; they were unarmed; they were outnumbered six to two; and the situation unfolded over a few minutes, not a few tense and dangerous

15

seconds.[6] *See* 128 F.3d at 822. The final *Sharrar* factor, physical injury to the plaintiff, weighs in Will's favor, because he sustained a hip contusion—although the injury is relatively minor. *See id.*

The dissent disagrees with the definition of the right at issue, maintaining that the definition is not specific enough and should encompass facts not found by the District Court. We agree that the right must be defined with specificity. *See, e.g.*, *Kisela*, 138 S. Ct. at 1152-53. Here, however, the District Court followed that directive and did not speak at "a high level of generality." *See Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Moreover, the presence of the video in the record does not permit us to embark upon our own factfinding exercise. Rather, as noted, "we must accept [the] set of facts" the District Court found, *Blaylock*, 504 F.3d at 409, unless the video "quite clearly contradicts" them, *Scott*, 550 U.S. at 378.

---

[6] Although, as explained above, the relevant time frame for Lieutenant Kacsuta to potentially intervene was limited to the few seconds of Officer Welling's sudden use of force, the question here is different and the relevant time frame is different. The question is whether Will's right not to be slammed and taken down was violated. The relevant time frame is Officer Welling's entire involvement in the encounter, which was a few minutes, not just a few seconds. Those minutes allowed Officer Welling to know that the Els were unarmed and to understand that they believed they were being harassed. This is unlike a case where an officer had "'mere seconds to assess the potential danger' posed by [an] armed and non-compliant plaintiff" and his "interaction with [the plaintiff] was over within seconds of his arrival on the scene." *James v. N.J. State Police*, 957 F.3d 165, 172 (3d Cir. 2020) (quoting *Kisela*, 138 S. Ct. 1153).

Officer Welling and the dissent believe that the articulation of the right should include that Will "point[ed] at an officer, and ignore[d] a gesture to sit back down." Dissent, Part I. The District Court made no findings to that effect. *El*, 2018 WL 3707420, at \*4. While it may be one interpretation of what happened, another interpretation could be that Will was merely gesturing, as was Officer Welling, with no apparent intent or direction. The dissent also believes that the right should include the fact that when Officer Welling pushed Will back, he did "not los[e] his footing." But the video does not clearly contradict the District Court's finding that Officer Welling slammed Will "back into the wall of the vacant storefront . . . and on to the pavement." *Id.* The video shows that as Officer Welling pushed Will back, one of Will's feet extended forward and the other remained under him while his body lowered to the ground. For a few moments, he seemed to be supported by the wall. He then sank to the pavement with Officer Welling still holding his wrist and, apparently, supporting his weight at least partially. JA72 (Video at 13:47:05-10). None of this video evidence blatantly contradicts the District Court's findings about these moments. *Scott*, 550 U.S. at 379-80.

*Scott*'s rule, permitting us to disregard factual findings that no reasonable jury could believe, is "a narrow exception to the limits . . . on our jurisdiction" on review of a denial of qualified immunity. *Williams*, 967 F.3d at 258; *see also id.* at 262 (reiterating principle that "we generally lack jurisdiction to review the genuineness of [a factual] . . . dispute"). We should apply *Scott*'s narrow exception carefully and strictly, rather than viewing it as an invitation to find our own facts. Therefore, the dissent's preferred articulation of the right at issue is not available to us within the limits of our jurisdiction.

17

A final point regarding the definition of the right: Officer Welling is correct that "an action under section 1983 [may] not be maintained on the basis of events leading to a conviction which has not been reversed . . . if a judgment in favor of the plaintiff in the civil case would imply that the conviction was invalid." *Nelson v. Jashurek*, 109 F.3d 142, 144 (3d Cir. 1997) (citing *Heck v. Humphrey*, 512 U.S. 477, 485-87 (1994)). The District Court's definition of the right, however, does not implicitly undermine Will's disorderly conduct conviction. Will was convicted of "creat[ing] a hazardous or physically offensive condition" with "intent to cause public inconvenience, annoyance or alarm." 18 Pa. Cons. Stat. § 5503(a)(4). Therefore, his § 1983 claim would be barred by *Heck* if, in order to prevail, he needed to demonstrate that he did not do so. But, even if an individual is engaged in disorderly conduct, there still could be a level of responsive force that is reasonable and a level that is "excessive and unreasonable." *See Nelson*, 109 F.3d at 145. Viewing the facts in the light most favorable to Will, a jury could conclude that Officer Welling's use of force was objectively unreasonable, even taking Will's disorderly conduct into account.

## 2. Clear establishment of the right

Plaintiffs may show that a right is clearly established by "point[ing] either to 'cases of controlling authority in their jurisdiction at the time of the incident' or to 'a consensus of cases of persuasive authority.'" *al-Kidd*, 563 U.S. at 746 (Kennedy, J., concurring) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). In the absence of controlling authority from the Supreme Court or this Court, the District Court correctly looked to excessive force cases from our sister Circuits that involve police use of non-deadly force on unarmed, uncooperative citizens who were not suspected of serious crimes. *El*, 2018 WL 3707420, at *11. These cases establish a

18

consensus that such an individual has the right not to be taken to the ground during an investigatory stop when he stands up and takes one or two small steps towards a police officer who is standing a few feet away.

In *Deville v. Marcantel*, 567 F.3d 156, 161 (5th Cir. 2009) (per curiam), the plaintiff was pulled over for speeding. She said she was following the speed limit, swore, refused to get out of her car, and rolled up her window. *Id.* Officers smashed the window, pulled her out of the car, threw her up against it, and handcuffed her. *Id.* at 162. The district court granted summary judgment to the officers on the plaintiff's § 1983 excessive force claim based on qualified immunity, and the Fifth Circuit reversed. *Id.* at 164, 167-69.

In *Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681, 683-84 (6th Cir. 2006), the police went to the plaintiff's home to execute an arrest warrant for a misdemeanor, but she hid in a closet and disobeyed orders to come out. *Id.* at 683-84. The officers pepper sprayed her, and when she refused to present her hands for cuffs, they struck her with a stick and repeatedly took a knee to her back. *Id.* at 686. The district court granted summary judgment to the officers, but the Sixth Circuit reversed, holding that they were not entitled to qualified immunity. *Id.* at 683, 688.

In *Montoya v. City of Flandreau*, 669 F.3d 867, 869 (8th Cir. 2012), police were called to a home where a man and woman were arguing. The woman "raised her right hand in a fist and took a step forward toward [the man]." *Id.* at 870. The officers attempted to handcuff her, and when she resisted, swept her leg from under her so that she fell to the ground. *Id.* at 869. The plaintiff broke her leg in the fall. *Id.* at 870. The district court granted summary judgment to the officer who swept the plaintiff's leg, concluding that he was entitled to

qualified immunity. *Id.* at 870. The Eighth Circuit reversed. *Id.* at 871-73.

In *Thornton v. City of Macon*, 132 F.3d 1395, 1398 (11th Cir. 1998) (per curiam), a woman called the police to retrieve a mattress from the apartment of a man with whom she once lived. The man refused to return the mattress and told the police to leave. *Id.* The police persuaded him to open the door and then "charged into the apartment[,] . . . . threw [him] to the floor, cuffed his hands behind his back, picked him up by his arms, dragged him outside and shoved him into a police car." *Id.* His bystanding friend was treated similarly. *Id.* The district court denied the officers' summary judgment motions, ruling that they were not entitled to qualified immunity. *Id.* at 1397. The Eleventh Circuit affirmed. *Id.* at 1400.

These cases from our sister Circuits establish a "consensus . . . of persuasive authority," *al-Kidd*, 563 U.S. at 742 (quoting *Wilson*, 526 U.S. at 617), that an unarmed individual who is not suspected of a serious crime—including one who is verbally uncooperative or passively resists the

police—has the right not to be subjected to physical force such as being grabbed, dragged, or taken down.[7]

Officer Welling argues that even if Will had a Fourth Amendment right to be free of the kind of force he used, that right was not clearly established in July 2013, when the incident took place. To support this argument, he launches various attacks on the cases the District Court relied on—but none of these attacks succeed in dismantling the consensus of persuasive authority.

First, Officer Welling argues that two of the cases were published in 2017 and, therefore, cannot clearly establish Fourth Amendment rights as of 2013. He is correct that the question is what the case law held "at the time of the incident."

---

[7] The dissent states that our holding places "unrealistic expectations" on Officer Welling because he "was supposed to realize – in an instant, from four factually dissimilar out-of-circuit decisions – that a grab-and-shove-to-secure under these circumstances was clearly established as unconstitutional." Dissent, Part II. We disagree that the out-of-circuit cases are factually dissimilar, as they involve unarmed individuals who were not suspected of a serious crime and were uncooperative or passively resistant. More fundamentally, the dissent's criticism takes issue not with our opinion, but with the qualified immunity analysis itself. It is black-letter law that an officer is not protected from suit when he or she acts in a way that runs against "a robust consensus . . . of persuasive authority," *al-Kidd*, 563 U.S. at 742 (quoting *Wilson*, 526 U.S. at 617), regarding what conduct violates the Constitution. If it were too much to ask an officer to know constitutional principles established by a consensus of cases from outside his or her Circuit, the Supreme Court would need to solve that problem.

*al-Kidd*, 563 U.S. at 746 (Kennedy, J., concurring) (quoting *Wilson*, 526 U.S. at 617). However, the District Court's citation of two 2017 cases does not mean that the right was not clearly established in 2013. The Court took care to note that each of the 2017 cases relied on pre-2013 case law. *See El*, 2018 WL 3707420, at *11 (noting that *Smith v. City of Troy*, 874 F.3d 938, 945 (6th Cir. 2017) (per curiam), relied on a 2006 case, *Shreve*, 453 F.3d at 687, and *Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017), relied on a 2009 case, *Deville*, 567 F.3d at 167-69).[8]

Officer Welling is also correct that unpublished cases, which are not binding, cannot establish a right. *See, e.g.*, 2d Cir. L.R. 32.1.1(a); 3d Cir. I.O.P. 5.7. And, as Officer Welling notes, the District Court relied on two unpublished decisions. *El*, 2018 WL 370742, at *11 (citing *Weather v. City of Mount Vernon*, 474 F. App'x 821 (2d Cir. 2012), and *Santini v. Fuentes*, 739 F. App'x 718 (3d Cir. 2018)). Still, the District Court's citation to these cases is neither here nor there. As we discuss above, a consensus of persuasive authority clearly established the right.

---

[8] The District Court may have cited the 2017 cases because of their factual similarities to this case, intending to show that the Fifth and Sixth Circuits had held that the case law clearly established, based on pre-2013 cases, the right of an individual in Will's situation not to be taken to the ground. *See Hanks*, 853 F.3d at 742-43 (plaintiff made a "small lateral step" with his empty hands visible to the officer, and the officer struck his upper back in a "half spear" and forced him to the ground); *Smith*, 874 F.3d at 942 (plaintiff was not following police instructions, and officer "took [him] to the ground with a leg sweep").

Officer Welling's remaining arguments about the lack of a clearly established right are also unpersuasive. It is irrelevant that *Montoya* comes from the Eighth Circuit, which is "geographically distant" from the Third. Appellants' Br. 25. The "robust consensus of cases of persuasive authority," *al-Kidd*, 563 U.S. at 742 (internal quotation marks omitted), need not be from nearby courts. Nor is *Montoya* distinguishable on the basis that the officer and the plaintiff were standing ten to fifteen feet apart, 669 F.3d at 872, unlike Officer Welling and Will, who were one or two steps apart. Officer Welling implies that he was in more danger than the officers in *Montoya*, but there, the two officers were outnumbered by four civilians. *Id.* at 869. Here, the reverse was true—the six officers significantly outnumbered the two El brothers, *El*, 2018 WL 370742, at *4. Therefore, *Montoya* cannot be distinguished away based on relative danger.

Officer Welling also argues that *Thornton* could not establish a right because a later Eleventh Circuit case commented that it is unclear whether the problem in *Thornton* was the use of excessive force or the use of any force at all. *Jackson v. Sauls*, 206 F.3d 1156, 1171 n.20 (11th Cir. 2000). We disagree that *Thornton* is unclear; it holds straightforwardly that "[u]nder the circumstances, the officers were not justified in using *any* force." 132 F.3d at 1400. But regardless, *Thornton* helps to establish the right of an unarmed, uncooperative individual, who is not suspected of a serious crime, to be free from being dragged, slammed, or taken to the ground.

For his part, Will argues that we should affirm on an alternative ground—that his right to be free of the kind of force Officer Welling used is clearly established by the excessive force factors provided in *Graham*, 490 U.S. at 396, and our opinion in *Sharrar*, 128 F.3d at 822. The factor-based tests of

*Graham* and *Sharrar*, however, are "cast at a high level of generality" and "can clearly establish the answer, even without a body of relevant case law," only "in an obvious case." *Brosseau*, 543 U.S. at 199 (internal quotation marks omitted). We have concluded that cases are obvious, and that general standards clearly establish a right, in extreme situations such as when lethal force is used, *Russell v. Richardson*, 905 F.3d 239, 252 (3d Cir. 2018), or when a high school teacher sexually harassed and assaulted students, *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 727 (3d Cir. 1989).

This case does not present that kind of situation, but the *Graham* and *Sharrar* factors nevertheless buttress the robust consensus of persuasive authority from our sister Circuits. As discussed above, the factors all tend to show that Officer Welling's force was excessive: there was no serious crime, no immediate safety threat, and no resistance or flight by the Els; they were not armed and were significantly outnumbered. *See Graham*, 490 U.S. at 396; *Sharrar*, 128 F.3d at 822. While we would not hold that these factors, by themselves, clearly established Will's right to be free of the kind of force Officer Welling used, they support the consensus of cases that show clear establishment of the right.

The dissent disagrees with our analysis of the *Graham* and *Sharrar* factors, asking, for example, "Do not standing suspects pose more of a safety and flight risk than seated suspects?" Dissent, Part II. Perhaps, but the threat posed by an unarmed individual surrounded by police is minimal, even if he is standing. The dissent discounts the officers' six-to-two advantage over the Els, saying that only three officers were standing nearby and one of them, Lieutenant Kacsuta, was shorter than the Els. This disregards the realities of the situation and considerably undersells the officers' capabilities. All of the officers were close enough to lend a hand if needed. *See* JA72

24

(Video at 13:47:05-17, showing other officers running up as Officer Welling took Will down). In addition, we have no doubt that even police officers of relatively small stature have the training and tools to subdue citizens of all sizes.[9] To support the assessment that the Els were in fact violent or dangerous, the dissent points to the fact that Beyshaud swung at Officer Welling, but that was after Officer Welling grabbed Will by the wrist and neck. The information Officer Welling had when deciding whether to use force in the first place was the brothers' behavior to that point—and their behavior was not violent or dangerous, only indignant.

\* \* \*

Many police excessive force cases arise from dangerous situations with multiple unknowns, such as when a plaintiff flees in his car through a neighborhood with heavy pedestrian traffic, *Davenport v. Borough of Homestead*, 870 F.3d 273, 280 (3d Cir. 2017), or is "running in close proximity to [a] shooting" and disregards orders to get to the ground, *Williams*, 967 F.3d at 260. This is not one of those situations. Viewing the facts in the light most favorable to Will, as we must, the danger to the police and the community was virtually nil. Officers approached two young men who were not engaged in any facially suspicious behavior; they were leaving a corner store. It became clear almost immediately that the men were not armed and that if any offense was being committed, it was, at most, an underage tobacco purchase. The men were upset to be stopped and said so. They did not flee. They were

---

[9] Lieutenant Kacsuta had a long career with the Pittsburgh police prior to 2013; clearly, her height was not a hindrance to her performance of her duties. *See El*, 2018 WL 3707420, at \*5 (noting that Kacsuta had attained the rank of sergeant as of 2003).

25

outnumbered six to two. One of them created a hazardous or offensive condition by standing up and taking a few small steps. Under these circumstances, a jury could conclude that taking Will down was an unreasonable use of force. And a consensus of cases from our sister Circuits establishes that in a situation like this, a plaintiff has the right not to be taken to the ground.

In reaching this conclusion, we are mindful that reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. There must be "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Officer Welling may have been called upon to make a split-second decision when Will stood up and took a few steps, but his decision was made with the knowledge that Will was unarmed and outnumbered.

For these reasons, Officer Welling is not entitled to summary judgment based on qualified immunity.

## IV.

We will reverse the denial of summary judgment on the excessive force claim against Officer Kacsuta, affirm the denial of summary judgment on the excessive force claim against Officer Welling, dismiss the portion of the appeal related to the denial of summary judgment on the state law claim as to Officer Warnock, and remand for further proceedings.

26

*El v. City of Pittsburgh*, No. 18-2856

PHIPPS, *Circuit Judge*, concurring in part and dissenting in part.

I agree with the Majority Opinion's reversal of the District Court's order with respect to Lieutenant Reyne Kacsuta. I also agree with the jurisdictional dismissal of Officer Ryan Warnock's appeal because qualified immunity does not apply to state-law tort claims. But in two respects I part ways with the Majority's affirmance of the order denying qualified immunity to Officer Frank Welling at summary judgment. First, I do not believe that the Majority Opinion articulated the putative constitutional right at issue with the high level of specificity required for the qualified immunity analysis. Second, in my view, it is far from clearly established that Officer Welling's use of force against Will El – a grab-and-shove-to-secure, which resulted in a bruise on the hip – was unconstitutionally excessive. Thus, I respectfully dissent in part and would reverse the order denying qualified immunity to Officer Welling.

I.  THE MAJORITY OPINION DOES NOT DEFINE THE CONSTITUTIONAL RIGHT AT ISSUE WITH THE HIGH LEVEL OF SPECIFICITY REQUIRED FOR THE QUALIFIED IMMUNITY ANALYSIS.

Because "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law,'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citation omitted), the contours of the asserted constitutional right must be articulated with specificity. And if precedent does not make clear to "every reasonable officer" that certain conduct is

unlawful in a particular circumstance, then an officer taking action in that situation is entitled to qualified immunity. *District of Columbia v. Wesby*, 138 S. Ct. 577, 590, 592 (2018). Thus, defining the right at issue with specificity is critical for evaluating whether every reasonable officer would know that certain conduct is unlawful under the circumstances. Such specificity is "particularly important in excessive force cases." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019).

I do not believe that the Majority Opinion articulates the putative constitutional right with the requisite level of precision. The Majority describes the Fourth Amendment right in this way:

> The right of an unarmed individual not to be taken to the ground during an investigatory stop when he stands up and takes one or two small steps towards a police officer who is standing a few feet away.

Maj. Op. at III.B.1 (alteration omitted); *see also id.* at III.B.2. But that articulation ignores important facts. It does not mention that Will El arose and extended an arm to point at an officer at close range. It also neglects that Officer Welling gestured for Will to sit down and that Will refused to. And Officer Welling did not initially take Will to the ground. Before the situation escalated, Welling grabbed and pushed Will back into a boarded-up window with Will maintaining his footing.

Each of those aspects of the incident can be seen from dashboard camera video, which provides a basis for reviewing an officer's use of force. *See Scott v. Harris*, 550 U.S. 372,

2

378-81 (2007). During the detention, the El brothers, Will and Beyshaud, were seated on a step, curb-height elevated from the sidewalk, and while narrow in depth, the ledge spanned the frontage of an entrance to a boarded-up building. As they sat, the El brothers were facing the officers, and they had their backs to the building. At one point, Will complained to Officer Welling that the police were harassing him. After Officer Welling responded, Will stood up and extended his arm toward Officer Welling, who gestured for him to sit down. Ignoring that gesture, and instead of sitting down, Will turned away from Officer Welling and toward Lieutenant Kacsuta, shuffling his feet one or two times. At that moment, Welling grabbed Will by both the neck and wrist and pushed him so that his back was against the boarded-up window. One of Will's feet was on the ledge, and the other remained on the sidewalk.

The situation escalated from there. Beyshaud arose and attempted to punch Officer Welling. Officer Warnock then tasered Beyshaud. Then Welling took Will from leaning with his back against the boarded-up window to a face down position on the sidewalk for handcuffing. After the incident, Will had a bruise on his hip.

Will El's excessive force claim against Officer Welling relates only to Welling's initial use of force – the grab-and-shove against the boarded-up window. No one disputes that after Beyshaud arose and attempted to punch Officer Welling, Welling was justified in taking Will to a face down position on the sidewalk for handcuffing. *See generally* Appellees' Br. (repeatedly characterizing Officer Welling's use of excessive force as when he "grabbed Will El by the neck and slammed him into a wall").

3

Given these facts, I disagree with the Majority's definition of the right at issue. The inquiry into the putative right should be expressed this way:

> Whether an unarmed individual who arises to his feet in close range to a police officer, points at an officer, and ignores a gesture to sit back down has a Fourth Amendment right not to be grabbed and shoved backward into a vertical structure while not losing his footing.

Such an articulation includes the three omitted events that would matter to every reasonable officer: that Will stood up and extended an arm to point at an officer at close range; that Will ignored Officer Welling's gesture to sit down; and that, as far as the complained of use of force, Welling did not tackle Will or take him to the ground. By excluding these important details, which are plainly evident from the video recording, the Majority Opinion does not identify the right with the "*high* 'degree of specificity'" required. *Wesby*, 138 S. Ct. at 590 (quoting *Mullenix*, 577 U.S. at 309) (emphasis added).[1]

---

[1] *See City of Escondido*, 139 S. Ct. at 503; *see also Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 173 (3d Cir. 2017) ("[W]e must frame the right at issue in a more particularized, and hence more relevant, sense, in light of the case's specific context, not as a broad general proposition." (internal quotation marks omitted)); *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 638 (3d Cir. 2015) (holding that the Court "must define the right allegedly violated at the appropriate level of specificity" because to do otherwise would "controvert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging

II.   OFFICER WELLING'S CONDUCT WAS NOT CLEARLY ESTABLISHED AS AN UNCONSTITUTIONAL USE OF EXCESSIVE FORCE.

Under either formulation (the Majority's or mine), the constitutional right at issue was not clearly established. For a constitutional right to be 'clearly established,' the legal principle "must have a sufficiently clear foundation in then-existing precedent." *Wesby*, 138 S. Ct. at 589. Such a foundation in precedent may rest on either "controlling authority" or "a robust consensus of cases of persuasive authority." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42 (2011) (internal quotation marks omitted); *see also Wesby*, 138 S. Ct. at 589-90; *James v. N.J. State Police*, 957 F.3d 165, 170 (3d Cir. 2020). The Majority Opinion does not identify any "factually analogous precedents of the Supreme Court [or] the Third Circuit." *James*, 957 F.3d at 170. Without controlling authority to meet the 'clearly established' threshold, the Majority relies instead on four decisions from other federal appellate courts as persuasive authority.[2]

While the 'clearly established' standard does "not require a case directly on point," those four cases fall well short of "a robust consensus of persuasive authority." *al-Kidd*,

violation of extremely abstract rights" (internal quotation marks and citations omitted)).

[2] *See* Maj. Op. at III.B.2 (citing *Montoya v. City of Flandreau*, 669 F.3d 867 (8th Cir. 2012); *Deville v. Marcantel*, 567 F.3d 156 (5th Cir. 2009) (per curiam); *Shreve v. Jessamine Cty. Fiscal Court*, 453 F.3d 681 (6th Cir. 2006); *Thornton v. City of Macon*, 132 F.3d 1395 (11th Cir. 1998)).

563 U.S. at 741-42 (internal quotation marks omitted). None of them involves a sufficiently analogous situation to this one to be "clear enough that *every reasonable official* would interpret [them] to establish the particular rule the plaintiff seeks to apply." *Wesby*, 138 S. Ct. at 590 (emphasis added). In *Montoya*, a woman resisted handcuffing, and one police officer grabbed her arm while another kicked her leg out from underneath her. *See* 669 F.3d at 869-70. That kick caused the woman to fall face first onto the ground and one officer to fall on top of her and break her leg. *See id*. But the actions of those officers and the degree of force that they used differ from this case: Will was pushed backwards while maintaining his footing, and he left with a bruised hip, not a broken leg. *Deville* involved a traffic stop and an individual who refused to get out of her vehicle. *See* 567 F.3d at 161. An officer grabbed and pulled the woman out of the car, pushed her against it, and handcuffed her resulting in a shoulder strain and lasting injury to her right elbow. *See id.* Will El was not in a vehicle, was not refusing to approach an officer, and did not leave with any lasting injury. *Shreve* involved the execution of an arrest warrant for a woman who refused to come out of her closet. *See* 453 F.3d at 683-86. There, after entering the house, an officer pepper sprayed the woman and jumped on her back with his knee while she was on the ground. *See id*. But this case does not involve a person hiding from police in her own home, pepper spray, or that level of force. In *Thornton*, as part of a civil property exchange, police officers charged into an apartment, threw a person to the floor, handcuffed him, and dragged him to the police vehicle. *See* 132 F.3d at 1398. Again, that is different than a grab-and-shove-to-secure during an investigatory stop on a sidewalk. If these out-of-circuit cases constitute a robust consensus that "squarely governs" this

scenario, then we need a new level. *Mullenix*, 136 S. Ct. at 310.

In reaching this outcome, the Majority Opinion places unrealistic expectations on law enforcement officers. According to the Majority, Officer Welling was supposed to realize – in an instant, from four factually dissimilar out-of-circuit decisions – that a grab-and-shove-to-secure under these circumstances was clearly established as unconstitutional. Apparently, in that split-second, Officer Welling should have had recall of an Eighth Circuit case from 2012, a Fifth Circuit case from 2009, a Sixth Circuit case from 2006, and an Eleventh Circuit case from 1998 – all of which occurred in different contexts and involved much greater force than the grab-and-shove-to-secure at issue here. *See Plumhoff v. Rickard*, 572 U.S. 765, 780 (2014) (rejecting that caselaw clearly established a right for a scenario in which "certain facts [were] more favorable to the officers"). Not only that, but Officer Welling – in the same moment – needed to determine whether those factually dissimilar, non-controlling cases represented a robust consensus of persuasive authority. Even if that were possible, that small handful of cases does not place Officer Welling's use of force "beyond debate," such that it was a clearly established Fourth Amendment violation. *al-Kidd*, 563 U.S. at 741; *see also Brosseau v. Haugen*, 543 U.S. 194, 200 (2004) (concluding that a right was not clearly established when the only relevant authority consisted of "a handful of cases" from other circuits).

Make no mistake, the Majority imposes a heightened standard for qualified immunity so that it no longer protects "'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 136 S. Ct. at 308 (citation omitted).

7

Officers without the acumen to conduct a synapse-quick legal analysis of factually dissimilar, out-of-circuit precedent will be denied immunity and subject to suit for their actions. The Majority responds that it is not applying a heightened standard but rather the black-letter law of qualified immunity. Maj. Op. at n.7. But in articulating the doctrine, the Supreme Court has not imposed such a high standard on officers. *See, e.g., Plumhoff*, 572 U.S. at 578-80; *Brosseau*, 543 U.S. at 200. To the contrary, the Supreme Court has recognized that "it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (internal quotation marks, alteration, and citation omitted).[3] Rather than acknowledge that difficulty, or even that the appropriateness of Officer Welling's use of force is not "beyond debate," *al-Kidd*, 563 U.S. at 741, the Majority faults Officer Welling for failing to instantaneously distill a loose collage of out-of-circuit caselaw into a robust consensus of persuasive authority that would apply to the particular circumstances of his use of force – which was *less than the amount of force used in any of those other cases*.

---

[3] *See also id.* ("[P]olice officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." (internal quotation marks and citation omitted)); *Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." (quotation omitted)).

To bolster its outcome, the Majority looks to borrow momentum from the factor-based tests of *Graham v. Connor*, 490 U.S. 386 (1989), and *Sharrar v. Felsing*, 128 F.3d 810 (3d Cir. 1997). *See* Maj. Op. at III.B.2. But those factors, ten in total, do not make this an "obvious case" or otherwise clearly establish that Officer Welling's use of force was unconstitutional. *Brosseau*, 543 U.S. at 199 (recognizing that the *Graham* factors may serve as a basis for a clearly established right in an "obvious case"); *see also James*, 957 F.3d at 169.

The *Graham* factors do not render Officer Welling's use of force excessive. As to the first factor – the severity of the offense – the Majority concludes that the offense for which the El brothers were detained (the underage purchase of tobacco) was not severe. But this factor does not merit much, if any, weight in the context of an officer, like Officer Welling, who did not initiate the detention and who responded to a call for backup. The Majority also concludes that the second and third factors – the immediacy of the safety threat and efforts to resist or evade arrest – were not met. But Will El arose and disregarded a gesture to sit down. Do not standing suspects pose more of a safety and flight risk than seated suspects? From the "peace of a judge's chambers," *Graham*, 490 U.S. at 396 (quotation omitted), that difference may seem small, but on the street, when a suspect increases the threat and flight level, it is too much to read the Constitution as prohibiting altogether the use of force.

I find the Majority's analysis of the *Sharrar* factors similarly unconvincing. As to the first factor, the Majority concludes that the Els were not violent or dangerous, *see* Maj. Op. at III.B.2, but in a flash Beyshaud arose and attempted to

9

punch Officer Welling. Nor did Welling have the duration of the detention to contemplate his use of force – as the Majority suggests. *See* Maj. Op. at n.6. Rather, Officer Welling had to make a split-second decision on his use of force: he had an opportunity to secure Will after Will arose, disregarded a gesture to sit down, and looked away. *See id.* at I.A. ("The events that happened [surrounding Welling's use of force] cascaded quickly and were over in about ten seconds."). The Majority also counts the outnumbering of officers to detainees as six to two. But that statistic alone does not provide an accurate description. Only three of those officers were on the sidewalk next to the El brothers, and one of those three, Lieutenant Kacsuta, who was the object of Will El's attention at the moment of Officer Welling's use of force, is smaller in stature than the El brothers. Finally, it should not be minimized that Will's reported injury – a bruise on the hip – is minor.

Under the *Graham / Sharrar* factors, this is not an "obvious case" of excessive force. *Brosseau*, 543 U.S. at 199. Instead, these factors generate uncertainty, and that further undermines the Majority's conclusion that Officer Welling violated a *clearly established* constitutional right.

\* \* \*

In sum, I concur in part and respectfully dissent in part. As I understand the law, qualified immunity shields Officer Welling from suit because at the time of the incident, it was not clearly established that a grab-and-shove-to-secure, which resulted in a bruise on the hip, constituted excessive force in violation of the Fourth Amendment. Given the caselaw at the time, these events occurred in the "hazy border between excessive and acceptable force" in which law enforcement

officers are entitled to qualified immunity.  *Mullenix*, 136 S. Ct. at 312 (internal quotation marks and citation omitted).